LITTLE COTTONWOOD WATER CO. v. KIMBALL et al.

No. 4707. Decided March 5, 1930. (289 P. 116.)

244

*C. W. Morse* and *Critchlow & Critchlow*, all of Salt Lake City, for appellant Kimball.

*George P. Parker*, Attorney General for appellant state engineer.

*Fabian & Clendenin*, of Salt Lake City, for respondent.

*Shirley P. Jones*, City Attorney, *Carl A. Badger*, and *Rich & Rich*, all of Salt Lake City, amicus curiae.

CHERRY, C. J.

In 1925 appellant Kimball made an application to the state engineer, under Laws Utah 1919, c. 67, § 42, to appropriate ten second feet of water from Little Cottonwood creek, a natural stream of water in Salt Lake county, and a further application, under Laws Utah 1919, c. 67, § 9, as amended by Laws Utah 1921, c. 72, for permission to turn ten second feet of water which he proposed to bring from Utah Lake into the channel of Little Cottonwood creek and to divert an equal quantity of water from the channel at a point above. For convenience, the applications are designated "the application to appropriate" and "the application to exchange," respectively.

The plaintiff Little Cottonwood Water Company, a prior appropriator of water of Little Cottonwood creek, filed protests with the state engineer against both applications. The protest against "the application to appropriate" was that there was no unappropriated water in the source, and "the application to exchange" was opposed because the proposed exchange would deteriorate the quality of the original water of Little Cottonwood creek. The state engineer, notwithstanding the protests, approved both applications. To review the action of the state engineer and by way of appeal the plaintiff brought this action in the district court of Salt Lake county. See Laws Utah 1919, c. 67, § 54. The district court tried the issues, made findings, and rendered a judgment that both applications be disapproved and denied. From the judgment thus rendered, the applicant, Kimball, and the state engineer have appealed. The appeal here is upon the judgment roll, which contains the pleadings, findings, and judgment, but not the evidence. It is contended by the appellants that upon the findings made both applications should be ordered approved.

We first consider "the application to appropriate." The ultimate question is whether the order rejecting the application should be sustained upon the grounds that there is no unappropriated water in the proposed source. The statute (Laws Utah 1919, c. 67, § 48) provides:

"Where there is no unappropriated water in the proposed source of supply, or where the proposed use will conflict with prior applications or existing rights * * * it shall be the duty of the State Engineer to reject such application."

This controversy, in the main, depends upon the interpretation and application of this provision of law.

The question is important because, on the one hand, the statute ought not to be a shield of protection to prior appropriators who divert water in excess of their reasonable necessities; and, on the other hand, the owners of genuine

established rights should not be harassed and disturbed in the enjoyment of their rights by groundless claims of later applications. In the arid region water is precious, and it is the undoubted policy of the law to prevent its waste and promote its largest beneficial use. Water is a bounty of nature, and, while prior rights to its use are obtained by those who first apply it to a beneficial use, those rights are limited to the quantities reasonably necessary for the uses to which it is applied. This is a cardinal principle of law of prior appropriation. When a dispute arises between an applicant for a new appropriation and the prior appropriators as to whether there is unappropriated water in the source of supply, two questions naturally arise, viz.: (1) What is the total supply? and (2) What is the extent of existing rights? In the case of many of the canyon streams in this state, where the volume of stream flow varies and fluctuates not only from year to year but during each year, it is a most difficult matter to determine with any degree of certainty what the future supply will be. And the determination of existing rights, in many cases, involves intricate and difficult questions of both law and fact, and is peculiarly a judicial function.

Can it be said that the Legislature intended, by the statute quoted, to vest the power to make such adjudications in the state engineer? Of course the extent of prior rights must be determined before there can be any exercise of secondary rights, but it is premature and impracticable to make such determination before any secondary claim is initiated. It is the initiation of his claim which qualifies the prospective appropriator to challenge existing claims.

The approval of an application to appropriate is only a preliminary step. It confers upon the applicant no perfected right to the use of water. It does not in any degree impair or diminish the existing rights of others. It merely clothes the applicant with authority to proceed and perfect, if he can, his proposed appropria-

tion by the actual diversion and application of the water claimed to a beneficial use. If in so doing he collides with conflicting claims, his standing as a prospective appropriator makes him a party in interest and qualifies him to assert his prospective right and to question conflicting claims. Unless his application has been approved, he is without interest in the subject-matter, unable to prosecute his claim or to question prior claims.

The state engineer has not the facilities to inquire into and determine the extent of existing rights, except in a very general way. Under the language of the statute it is not a prerequisite to the approval of an application that the state engineer find affirmatively that there is unappropriated water in the proposed source. The proposition is stated in the negative, and it is only when there is no unappropriated water in the source that the application is to be rejected. Since the policy of the law is to prevent waste and promote the largest beneficial use of water, new appropriations should be favored and not hindered. In a doubtful case, when the conclusion is not clear, it is more consistent with sound policy and with the general scheme of the law, to approve the application to appropriate and afford the new claimant the legal status and the opportunity to proceed in due order of law and have the disputed questions definitely and authoritatively determined, rather than to shut off such determination by the denial of his application.

These considerations support the conclusion that the only practical application of the statute quoted is to a case where it clearly appears that there is no unappropriated water in the proposed source. This would occur for example, where a general adjudication, of which notice to all persons had been given, or where perfected appropriations and prior pending applications of record in the engineer's office, established the appropriation of all available water of the source. But if the question is fairly doubtful and there is reasonable probability that a portion of

the waters are not necessary to supply existing rights the engineer should have the power to approve the application and afford the applicant the opportunity for an orderly recourse to the courts, who have the facilities and powers to dispose of the matter definitely and satisfactorily.

The decisive question on this branch of the case is whether, under the facts as found by the court, the application must necessarily be rejected.

In the application in question it was stated that the water applied for was to be stored in a reservoir each year from January 1st to December 31st and used for irrigation each year from April 1st to October 31st upon designated lands. In an explanatory note it was stated:

"The following additional facts are set forth in order to define more clearly the full purpose of the proposed appropriation:

"The water applied for under this application is to be acquired through the construction of a pipe line to supply culinary water to those dependent upon the flow of Little Cottonwood through open channels for domestic purposes. The water so saved will be stored in what is known as the Beaver Pond Reservoir during the non-irrigation season and released for use upon the land described during the irrigation season. * * *"

The findings of fact made by the district court necessary to be noticed are, in substance, as follows: That Little Cottonwood creek is a mountain stream with a volume of flow varying during each year from a monthly average of 14½ cubic feet per second during the lowest period in January to over 250 cubic feet per second during the highest period in the month of June; that on June 16, 1910, in an action pending between Union & East Jordan Irrigation Company, plaintiff, and Richards Irrigation Company, et al., defendants, the district court of Salt Lake county made and entered a decree that certain of the defendants were the prior appropriators of and entitled to use for irrigation and domestic purposes all of the "primary water" or "nor-

mal flow" of the stream; that neither the applicant, Kimball, or the state engineer, were parties to the said decree; that, except during a comparatively short period in the months of May and June of each year, when the flow of said creek is at its peak, all of the normal flow thereof during the irrigation season has been, for many years, by means of open canals and ditches, diverted and used by plaintiff, its stockholders and others, for irrigation and domestic purposes during the period of each year from April 1 to October 15; that many of such persons also have rights to use said waters for culinary and domestic purposes during the time when the water is not used for irrigation, and that for many years such users have diverted through open ditches and canals an average of not less than fifteen second feet of water for culinary and domestic use; that the quantity of such water actually used or consumed has not exceeded one cubic foot per second, but that nevertheless, under the system of distribution through open ditches and canals, it is reasonably necessary to divert from the stream fifteen second feet of water to supply at the respective places of use the necessary quantities of water for such use; that there is no evidence to show with certainty who the prior users of water mentioned are, or what their rights are, and nothing to show the plaintiff has any right to represent them; that the applicant, Kimball, proposes to construct, at his own expense, a pipe line through which the waters of the stream may be conducted to those entitled to the use of the same for domestic and culinary use, and thereby prevent the loss of at least ten cubic feet of water per second, which quantity he seeks to make available to supply his proposed appropriation.

Upon the findings made, the district court concluded as a matter of law that none of the waters of the creek were subject to appropriation in the manner proposed by the applicant and that the state engineer acted without authority or jurisdiction in approving the application.

From the findings it is apparent that there is a substan-

tial quantity of unappropriated water in the source. At the highest flow in the early summer the stream has a volume of over two hundred fifty cubic feet per second. It is nowhere claimed that during this period all of ■ the water of the stream is necessary for the use of prior appropriators. And, since the specific quantity of water claimed by prior users during any of the irrigation season is not shown, it is impossible to say that there is not an excess at other times. Any excess in the stream at any time over existing rights is open to appropriation by new claimants. For this reason alone the action of the state engineer should be approved.

But the main subject of dispute, both in the district court and here, is the novel proposal of the applicant to save the loss involved in the existing method of distributing the water for culinary and domestic use by substituting at his own expense a pipe line. The matter has been ■ very thoroughly and ably argued. That the applicant may proceed with his plan over the objection of prior appropriators in order that water may be conserved and its use enlarged has been affirmed on one side and stoutly denied on the other. We think the issue premature. The only question proper to be considered in this action is whether the applicant shall be denied approval of his application. If he can, by agreement with the parties interested or by any other lawful means, effect the saving of a loss of ten cubic feet of water per second, he ought not to be prohibited by law from proceeding to do it. It may well be that there is no authority of law whereby he may compel existing owners of water rights to submit to his visitation and disturbance of their premises by the construction of his proposed works thereon. But that question is not presented here. The issue here to be decided is whether, if he does accomplish his design, the water so rescued from loss may be awarded to him. His appropriation is dependent upon the execution of his scheme. If he cannot carry it out, he cannot perfect his appropriation. He

must meet and overcome whatever obstacles may cross his path. We may not anticipate or decide them. The inquiry on this branch of the case ends when, from the facts found, it cannot be said that there is no unappropriated water in the proposed source. That is the situation here, and the action of the state engineer in approving the application should be sustained.

With respect to the "application to exchange," we think the district court was right in ordering it denied.

The application was made under authority of Laws Utah 1919, c. 67 § 9, as amended by Laws Utah 1921, c. 72, which provides:

"Upon application in writing and approval of the state engineer, any appropriated water may be turned into the channel of any natural stream, * * * and commingled with its waters, and then be taken out, either above or below the point where emptied into the stream, * * * but, in so doing, the original water in such stream, * * * must not be deteriorated in quality or diminished in quantity. * * * "

The district court found as a fact that the water proposed to be turned into Little Cottonwood creek by the applicant was inferior in quality to the water of Little Cottonwood creek, and that the commingling of such waters would render the entire stream below the point of commingling unfit for domestic and culinary uses, that the commingling water is equally as good for irrigation purposes as the waters of the original stream, and that the applicant proposed at his own expense to construct a pipe line through which he would supply all persons entitled thereto from the stream with potable water for domestic and culinary use.

The statute expressly imposes as a condition of such exchange that the waters of the original stream be not deteriorated in quality. The condition is a most important one. It concerns public as well as private interests. The scheme for supplying potable water for domestic use

through a pipe line does not meet the requirements of the statute. The waters of the original stream would be deteriorated in quality, notwithstanding, in plain disregard of the statute.

For the reasons stated, the judgment of the district court directing the state engineer to reject and deny the application to appropriate is reversed and set aside, and the district court is directed to amend its conclusions of law and enter an order affirming and sustaining the approval of the application by the state engineer. The order of the district court directing the denial and rejection of the application to exchange is affirmed. No costs allowed to either party.

EPHRAIM HANSON, J., concurs.

ELIAS HANSEN, J. (concurring in part and dissenting in part).

I concur in the order reversing the decree of the district court and directing that court to amend its conclusions of law and to enter a decree affirming the order of the state engineer approving the application of Leland H. Kimball whereby he seeks to appropriate ten second feet of water from Little Cottonwood creek. I am of the opinion that a similar order should be made with respect to the so-called "exchange application."

The state engineer is granted power upon written application approved by him to permit appropriated water to "be turned into the channel of any natural stream * * * of water, * * * and commingled with its waters, and then be taken out, either above or below the point where emptied into the stream, * * * but, in so doing, the original water in such stream, * * * must not be deteriorated in quality or diminished in quantity." Laws Utah 1919, c. 67, § 9, as amended by Laws Utah 1921, c. 72; *Spanish Fork City* v. *Spanish Fork East Bench Irr. & Mfg. Co.*, 46 Utah 487, 151

P. 66; *United States* v. *Caldwell,* 64 Utah 490, 231 P. 434. My associates are of opinion that, as the water of Utah Lake is inferior in quality to the water of Little Cottonwood creek for domestic and culinary uses, the state engineer was not authorized to approve the so-called "exchange application." If the stockholders of the respondent company were, under the proposed plan of exchange, to be compelled to use Utah Lake water for domestic or culinary purposes, then the conclusions reached in the prevailing opinion would be clear. The stockholders of the respondent company, however, under Kimball's exchange application, will have no occasion to use Utah Lake water for any other purpose than that of irrigation. The water of Utah Lake is equal in quality to the water of Little Cottonwood creek for irrigation purposes. The district court so found, and such finding is not here questioned by anyone to this proceeding.

It is a cardinal principle of law that, in construing a statute, the primary and sole object of the courts is to give effect to the real purpose and intent of the Legislature. Courts frequently are required to either restrict or enlarge the ordinary meaning of words in order that the plain legislative purpose may be accomplished. It has ever been the law of this state that the title to water appropriated from a natural source has been in the public. The appropriator can acquire only a right to the use of the water. The rights of the appropriator are measured and limited by the beneficial use to which the water is put. If an appropriator uses water solely for irrigation purposes, his right should be measured and limited by the use for such purpose. I can perceive of no good reason why the provisions of the law which makes beneficial use the basis, the measure and the limit of all rights to the use of water in this state should not and does not apply to the quality of water as well as to the quantity of water which is put to a beneficial use. There can be no doubt but the purpose sought to be accomplished by limiting the right of private

ownership to water arising from natural sources was to make it impossible for an individual to prevent the further use and consequent development of our natural resources. The adoption of a rule of law that an appropriator of water suitable for culinary uses has a vested right to use such water for irrigation purposes when other water equally suitable for irrigation is made available to such appropriator without any additional cost to him might well tend to retard the development of this state as much as would the adpotion of a rule of law recognizing that an appropriator of water has a vested right to use more water than is reasonably necessary. When the early pioneers settled this region, they brought under cultivation the lower lands and diverted the water from mountain streams to irrigate the same. As our population has increased, the higher lands have been brought under cultivation wherever water is available for irrigation. It is upon about 1,200 acres of this higher land that Kimball proposes to use the water applied for. In his exchange application he proposes to take water out of Little Cottonwood creek during the irrigation season to irrigate the land and in lieu thereof turn into Little Cottonwood creek an amount of Utah Lake water equal to that taken out. He seeks the right to exchange Utah Lake water for Little Cottonwood water because the land which he proposes to irrigate is so high in elevation that the cost to elevate Utah Lake water to such land would be so great as to be practically prohibitive. If the exchange application is granted, Kimball can irrigate by gravity the 1,200 acres of land upon which he proposes to convey the Little Cottonwood creek water. The Utah Lake water will, under the proposed plan, be turned into Little Cottonwood creek above the point where the water of Little Cottonwood creek is now being diverted. Under the plan proposed in Kimball's applications, a pipe line system will take water out of Little Cottonwood creek above the point where the Utah Lake water is to be turned into Little Cottonwood creek and thus Little Cottonwood creek water for culinary

and domestic uses will be delivered at all times to the persons entitled thereto through the pipe line system. If culinary and domestic water from Little Cottonwood creek is diverted as proposed by Kimball through the pipe line system, it will reach the places for use in a better condition than when delivered through open canals and ditches. The pipe line system, under the proposed plan, is to be constructed and maintained without any cost to the water users.

If the result reached in the prevailing opinion is to become the established law in this jurisdiction, it means this: Even though our mountain streams may be used to render productive our otherwise barren higher lands, and even though the lower lands can be supplied with water equally suitable for irrigation and without cost to the lower lands, none the less the higher lands must forever remain barren and unproductive merely because the lower lands were the first to be irrigated with the water from our mountain streams. Such a policy on the one hand permits the perpetual waste of water available for the irrigation of our lower lands and on the other hand perpetually withholds from productivity vast areas of our state. It was for the very purpose of avoiding the evils that would necessarily flow from such a rule that the lawmaking power provided that "the waters of all streams and other sources in this state, whether flowing above or under the ground, in known or defined channels, is hereby declared to be in the public subject to all existing rights to the use thereof," and that "beneficial use shall be the basis, the measure and limit of all rights to the use of water in this state."

With the constant increase of our urban populations, there is an ever increased demand for more water suitable for culinary uses. The supply of water suitable for culinary uses is limited, and doubtless, in many instances, must be secured from water which has heretofore been used for irrigation purposes. Where there is a demand that water heretofore used for irrigation be applied to culinary and domestic purposes, I can see no good reason why such de-

mand should not be satisfied so long as those who have appropriated the water taken to satisfy such demand are supplied with an equal quantity of water equally suitable for the irrigation of their lands and without any cost to them. If water has been appropriated for the sole purpose of generating electric power, the appropriator should not be heard to complain merely because water has been turned into his source of supply which renders it unfit for irrigation and domestic purposes. So, likewise, an appropriator of water for extracting precious metals from ores should not be heard to complain merely because his source of supply has been rendered unfit for irrigation and domestic purposes. I believe the correct rule to be that, so long as quality of water supplied meets the requirements of the uses to which it is put, no vested right is infringed, and the appropriator may not be heard to complain.

Moreover, the quality of water is dependent upon the uses to which it is put. Water is good or bad, superior or inferior in quality, only when considered in connection with its use. Abstractly there are probably no two streams or sources of water supply within this state identical in quality. A strict adherence to the letter of the law might well defeat all applications for an exchange of water. In my opinion, a strict construction of our statute such as is adopted in the prevailing opinion with respect to the exchange application will defeat the very purposes for which the law relating to exchange of water was enacted. Water appropriators should not be permitted to play the part of the proverbial dog in the manger.

I am of the opinion that the state engineer properly approved both of Kimball's applications.

BRAMEL, District Judge (concurring in part and dissenting in part).

Little Cottonwood creek comes down a canyon on the west slope of the Wasatch Mountains and runs across Salt Lake Valley into the Jordan river. More than eighty years

ago the settlers in this valley constructed the Little Cottonwood canal and continuously since then have diverted water for irrigation and culinary purposes from said creek through said canal. During the peak of high water in the late spring or early summer the flow of the creek for a short period reaches a maximum of about two hundred cubic feet per second. During the period of lowest water, that is, midwinter, the average flow is in the neighborhood of fourteen cubic feet per second.

The irrigation season extends from about April 1 to about October 15. During the irrigation period all the waters of this creek are used for irrigation. In the winter practically all of the water in the creek is diverted by canals and distributed to the farmers under the canals for domestic use and for watering stock. The Little Cottonwood creek water has been used in the above manner by plaintiff and its predecessors in interest and by others continuously since 1848.

In November, 1925, the defendant filed with the state engineer an application to appropriate ten second feet of water of Little Cottonwood creek to be saved and stored by him by delivering to prior appropriators entitled to culinary and domestic waters by means of a pipe line system proposed to be installed by him. In this application he states that the water applied for is to be stored each year from January 1 to December 31 and is to be used from April 1 to October 31.

In December, 1925, the defendant filed a second application with the state engineer asking leave to exchange water of Utah Lake to be acquired by him for an additional ten second feet of water from said creek appropriated by prior appropriators.

Throughout the briefs and arguments, the first application is called the "storage" application or an application to appropriate, and the second application is called the "exchange" application.

Plaintiff protested the allowance of said applications and each of them, and, from the order of the state engineer denying said protest, the plaintiff appealed to the district court. In the district court the protests of plaintiff were sustained, and the court made a decree disapproving both applications and ordering the state engineer to cancel the same. From this decree defendants appeal.

The Little Cottonwood canal diverts water from the creek by means of a dam and open canal which has earth bottom and banks. During the nonirrigating season the plaintiff and other users divert into ditches and canals the larger part and at times all the flow of said creek, such amount averaging about fourteen second feet. The amount of water actually consumed by the people under the canals for domestic use and watering stock is about one second foot. About thirteen second feet of water carried in the ditches and canals is lost in evaporation and seepage. The applications of defendant are based upon his proposal to make a reservoir and dam in the creek and to conduct the irrigating and culinary water therefrom in pipes to the present owners of the winter waters and thereby save and appropriate the winter waters now lost. Defendant contends that in this manner he can redeem from waste and store for beneficial use the amount of water covered by his first application, to wit, ten second feet per day during the nonirrigating season. To this he proposes to add ten second feet of exchange water which he intends to acquire.

In the year 1910, in the case entitled *Union & East Jordan Irrigation Company, Plaintiff,* v. *Richards Irrigation Company et al., Defendant,* then pending in the district court of Salt Lake county, all persons who had any interest or claim in the waters of Little Cottonwood creek were parties to the action and were in court. The court then and there made a decree wherein it was adjudged that as early as 1856 all the waters of said creek had been appropriated to beneficial uses and that there was no more unappropriated water

in said stream. This decree is still in force. The defendants in this action were not parties in that suit.

Other facts will be stated in the opinion.

1. Is the water defendant seeks to appropriate public water? Is it subject to appropriation in the manner proposed?

It is a matter of historical knowledge and also of judicial notice that in the early days in the West the right to use water was acquired by diversion and user and without any other ceremony. In the first quarrels that arose, courts adopted the doctrine of priority. It was not permissible to divert water from a creek or other source to the prejudice of a valid prior appropriation.

The first statutes in Utah that bear upon this subject were passed in 1880. In those statutes the right to use water for any useful purpose is expressly recognized. Rights, presumably the existing appropriations, are acknowledged to be "vested rights" and deemed as "a primary right, to the extent of, and reasonable necessity for such use thereof." Comp. Laws Utah 1888, § 2780. The Little Cottonwood canal was constructed and the water therein was appropriated at least thirty years before the statutes of 1880 were passed. When Utah became a state January 4, 1896, "all existing rights" to the use of water "for any useful or beneficial purpose" were "recognized and confirmed." Constitution of Utah, art. 17, § 1. In 1903 the Legislature passed a law declaring the waters of all streams and other sources in this state, whether flowing above or under ground, in known or defined channels to be public property subject to all existing rights to the use thereof. This law is still in the statutes. Comp. Laws 1917, § 3463; Laws Utah 1919, p. 177, c. 67.

Our present statutes (Laws 1919, c. 67) provide that "rights to the use of the unappropriated public water in the State may be acquired * * * in the manner hereinafter provided, and not otherwise." Section 41. Follow-

ing this, the procedure for the appropriation of unappropriated waters is prescribed. It was this procedure the defendant followed in making the two applications involved in this action.

Under our statutes reasonable losses from evaporation and seepage are not classified as willful waste or a wrongful use of water. In fact our latest statutes provide that, in case one person uses the canal of another to convey additional water, he shall compensate the owner of the canal for the damage caused thereby, and the additional water turned in shall bear its share of the loss by evaporation and seepage. Laws Utah 1919, c. 67, § 5. A similar provision is found in section 9 of the same act.

It is a matter of common knowledge and also of legislative and judicial notice that evaporation and seepage occur in all open ditches and that the toll therefrom is quite heavy in ditches with earth banks and bottoms. We see that our law recognizes this toll and taxes a part of it to the user of another person's canal or ditch. If there is any remedy in a case where the loss from seepage is great enough to be called waste, the remedy is found in section 39 of chapter 67, Laws Utah 1919, which provides that, whenever any person or user of water from any source believes that there is a waste of water, he may report the matter to the state engineer or to the court; if to the engineer, he may investigate the matter and report his findings to the court. The jurisdiction to determine and adjudicate the matter is vested wholly in the court and nowise in the engineer. This point will be more fully discussed later. From the above it is very evident that the water lost in seepage is appropriated water devoted to a use and is not public water. It is water that has been removed from the creek for a use. That use includes three items which are: (1) To provide culinary and domestic water; (2) as necessarily implied, to pay the seepage toll; and (3) to have enough running water to carry the water to its place of use in a potable condition. The appropriation was made for these purposes and has been

devoted to these purposes continuously for nearly three generations. True, the use may not be of the most economical kind, but it is a beneficial use. It is not a waste of water in the sense affirmed by appellant. As well could he argue that there is a waste of lumber in building a house, because the sleepers and joist, not being exposed, are not directly consumed by the wear and tear of the weather. Seepage is a loss, but not necessarily a waste. It is a necessary loss in the earth canal and ditch system of water use which has prevailed in this state from the beginning. These older applications of necessity included in their scope enough water to cover the loss from evaporation and seepage in addition to the amount required for the chief use intended. Concrete and iron piping were not obtainable in those days.

I am of the opinion that the seepage of the Little Cottonwood canals is not unappropriated water, is not public water, and is not subject to appropriation under the laws of Utah. This use is a costly use, but it is a use that always was and still is necessary in the operation of the canal—a use as essential as that of the ditch itself.

The plan of appropriation proposed by appellant contemplates a dam and a reservoir that will impound practically all the winter waters and nonirrigation season waters of the creek, except such culinary water as he releases in pipe lines. This would leave the canals and ditches dry during a half of each year. Meanwhile these canals and ditches would dry out, and, when the farmers turned in the irrigation water in the spring, a large portion of it would be lost in seepage sucked into the dry ground. As a matter of plain arithmetic and plain common sense, it is manifest that, if these applications are allowed and consummated, the ultimate result will be that all the loss from seepage in all the canals and ditches under the creek will fall upon the irrigation waters of the farmers. It is equally manifest that, if the fundamental principle upon which the defendant relies is established, the seepage from this irrigation water will be subject to another appropriation to be "saved" for some purpose

or other and so again until all the water of the farmer is gone. The principle upon which appellant relies ignores our constitutional guaranty that private property shall not be taken or damaged for public use without just compensation. Our statutes do not expressly mention water or water rights as property subject to condemnation by a private person, but they do provide that cities may condemn water and water rights and in such cases the value of the land must be considered with the water. Yet in the case at bar we have a proceeding that is, indirectly at least, a species of condemnation without compensation. If this proceeding should be upheld by the court and the principle upon which it is based should be declared valid, the utmost confusion would follow.

A large part of agricultural Utah lies in a fertile valley along the west foot of the Wasatch Range. Fully three-quarters of the population of Utah live in this valley. It is watered and made productive by a number of mountain streams generally similar to the Cottonwood, that flow down the mountains and into the valley. Along all these streams the same general practice, custom, and methods of irrigation and of culinary use of water prevail and have prevailed since the pioneer days. To permit the appropriation of such seepage in the manner proposed would throw all these farming communities into turmoil and consternation. It would demand a sudden abandonment of long-established customs and methods and suddenly throw upon these none too prosperous farming communities the hard alternative of either losing their water or quickly building, at great cost, water-tight flumes and conduits.

Without actual experiment there is no way of telling how much irrigation water would be consumed in extra seepage if the canal were kept dry during the winter season. It is sufficient to say that there would be some extra seepage taken from the summer water if the winter flow were taken out of the canal. In fact, as I view this case, it would be sufficient to say, in this particular instance, that there

is danger of such a loss. Mere danger of loss to the farmers should defeat the appropriations made by appellant because the proposed proceedings contemplate no indemnity for such a loss. The case of *Big Cottonwood Tanner Ditch Co.* v. *Shurtliff*, 56 Utah 196, 189 P. 587; *Id.*, 49 Utah 569, 164 P. 856, is not at all in point upon the questions so far considered because that case was a contest between private parties over water privately owned and did not involve any question pertaining to appropriation.

I am of the opinion that the seepage water in question in this case is not subject to appropriation and that it is not public water, but, on the contrary, that it is private water lawfully appropriated and devoted to a use. The present use may not be an economical use, but it is a beneficial use that has existed for eighty years and has been tolerated by courts and recognized by statutes. This use cannot at this late date be called waste for the purpose of enabling whomsoever will to seize the water. When public necessity demands that the seepage of these systems be devoted to a higher use, the Legislature will speak, and I have little doubt that, when this event occurs, some provision will be made whereby the entire cost of saving the seepage for another's use will not be cast wholly upon the canal owner.

2. Another question arising in this case pertains to the extent of the authority of the state engineer to act in the matter of a stream that has been entirely appropriated and has been adjudicated by a court.

Laws Utah 1919, c. 67, § 39, provides, in substance, that, in case any person believes that there is a waste of water from any stream or water source, he may report the matter to the state engineer, or may petition the court for an investigation of the alleged waste, whereupon the engineer may make the investigation and report his findings to the court, or the court may order or make an investigation, and, if the investigation so warrants, may "Proceed to make a

determination, if such has not yet been had, or a redetermination, in whole or in part of the rights to the use of the water of said stream or source."

The following section, section 40, of said chapter, in substance, provides that, whenever a general determination of water rights upon any river system or water source has been made by the district court, any claimant of water seeking a redetermination of water rights in such source or seeking the revision of any final judgment other than as provided in section 21 shall, before commencing an action, furnish a bond to cover all costs that may be awarded against him and all damages that may result to parties therefrom. Section 21 above referred to provides for a special statutory proceeding not relevant to this case.

Section 32 of said chapter, referring to the special statutory proceeding, authorizes the engineer, in conducting said proceeding and before the court has made a final decree, to distribute water according to the engineer's determination until the court otherwise orders, provided that the rights to the use of said waters have not been heretofore decreed or adjudicated, said waters shall be distributed in accordance with such decree until the same be reversed, modified, vacated, or otherwise legally set aside.

Speaking to the very point mentioned in the proviso to section 32, this court said in *Eden Irrigation Co.* v. *District Court,* 61 Utah 103, 211 P. 957, 960:

"There is, therefore, not even a semblance of a right given to the engineer to interfere with adjudicated or so-called vested rights."

And speaking of alleged waste and the remedy therefor, the court further says:

"We have already pointed out, however, that although a user whose rights have been adjudicated may waste water the water must, nevertheless, be apportioned to him in accordance with the decree of the court until the fact that water is being wasted and the extent of such waste is judicially established; and when so established the decree may then be modified."

To the same effect are the cases of *Caldwell* v. *Erickson,* 61 Utah 265, 213 P. 182; *Tanner* v. *Beers,* 49 Utah 536, 165 P. 465; *Smith* v. *District Court,* 69 Utah 493, 256 P. 539.

The state engineer, even when administering a water system, must follow and abide by a former adjudication of a stream or water source. That adjudication is a judgment in rem as to him. It is made so by statute. If that judgment decrees that all waters in that stream are appropriated, the engineer is bound thereby until the decree is modified or set aside. It is a judgment by the state concerning subject-matter he is handling as an agent of the state, and it serves no purpose to say that he was not a party to the action. The state engineer was not a party to any of the actions that adjudicated the ancient rights in Utah streams and creeks. Most of these actions were begun, and many of them were adjudicated, years before there was a state engineer. The very words of the statute fixing the duties of the state engineer make these adjudications part of the rules he must follow and also make it plain that even a waste of water under a right once adjudicated is not to be cured by any method other than a modification of the decree that awarded the original right. The words of the statute make it equally plain that it is the intent and purpose of the entire act to validate and preserve the water rights established by former adjudications and to permit no interference therewith except by the prescribed procedure in the court that made the adjudication.

Against this view of the situation appellants urge the objection that the principles announced will prevent appropriations of waste water and prevent the saving of water now being wasted. A short answer to this contention is that the act does not deem water that has been appropriated and adjudicated and is in use to be public water. Nor does the law intend that the question of what use of water is waste or not waste shall be decided by an appropriator or by the engineer. The statutes expressly provide that this is a judicial question. But, in case the court does decide there

is waste, who is to get the amount of water saved? And how? Willful waste is one thing, and an inferior or uneconomical use is another thing. The courts in the statutory proceeding outlined may prevent waste and may decide whether the water being wasted belongs to other ditches or to the public. But, as before intimated, in a case where the court has decided that all the waters of a stream are appropriated and has apportioned those waters to various users, the presumption arises that there is no waste and that presumption exists until the court decides otherwise. In case the court later finds that there is a waste, the court may either relieve the parties prejudiced thereby, if any, or may, by stating the extent to which the water is unappropriated, restore the waste water to public ownership. But such a proceeding would be cumbersome and would not give the appellant any benefit, urge the appellants. This is true, and a similar complaint could be made by any claimant of property to which he is not entitled.

The attention of the court has been called to many cases wherein the waste of water is condemned. I concur in all that is said in these cases. The waste of water in arid regions is an evil that should be condemned. Water is a "precious fluid"; water is the "life of the desert." But precious to whom? Precious to the farmer who uses it to make the earth give forth her bounties; fully as precious to him as to any other member of the community.

Here another word as to what is a beneficial use as distinguished from a waste. This court takes judicial notice of the general geography of this state, of its history, and of the general facts of its agricultural condition and development and of how classes of men earn their bread. In short, a court is presumed to know what every man of ordinary intelligence must know about such things. We know that the hardy pioneers who made the canal in question had nothing to work with except oxen and plows; we know that they made earth canals and ditches. We know that seepage consumed much of the water diverted. We know that this

seepage loss was a necessary toll and that the ditch could not be used without paying that seepage toll. We know that seepage was not considered a waste of water in the sense in which appellant contends, but, on the contrary, was considered an incident of the appropriation and a use, and we know that our present statutes so recognize it. Now when did the seepage loss change from a use to a waste? When the appellant filed his paper with the engineer? Not at all. It has remained a use from the time the water was turned into the canal up to the present time.

To declare the seepage water waste in this particular instance or in instances like this where the waters of a stream have been fully appropriated and apportioned and distributed by adjudications to users, and to declare that such seepage waters are subject to appropriation would be to extend an open invitation to exploiters and adventurers to file appropriations on practically all the streams coursing down the west slope of the Wasatch Range. Such a ruling could and probably would destroy the peace, comfort, and good order of dozens of communities. It would jeopardize the rights and means of livelihood of many hundreds and probably thousands of honest, hard-toiling, frugally living farmers and their families.

The authority to make a ruling that might result in such evils does not rest with the state engineer or with any appropriator. As stated above, when public necessity demands that there be a change in customs, usages and methods in the use of water, the change will be made in an equitable and orderly manner. It is not improbable that measures for the salvage of seepage water, whether promulgated by the Legislature or by the court, will provide that those who propose to save the winter seepage in the ditches and canals of the farmers must furnish the farmers with cement canals or pipes so that the farmers will not be compelled to lose water in the irrigation season by "paying the soakage" of dry ditches. That such an idea is not repulsive to the judicial mind is indicated in the case of *Big*

*Cottonwood Tanner Ditch Co.* v. *Shurtliff*, supra. To that extent only is that case in point here.

I have no hesitation in saying that the state engineer had no authority to grant any application on the seepage water of the plaintiff company. Neither the word nor the spirit of the law gives him that authority.

3. As to the "exchange" application, I concur with the opinion of the CHIEF JUSTICE. In the storage application the appellant states that he "through agreement with the Draper Irrigation Company will acquire ten second feet of Utah Lake water," and that it is his intention to exchange this ten second feet of Utah Lake water for Little Cottonwood water so purchased in the reservoir proposed by his first application and furnish culinary water therefrom in a pipe line to those who "are affected by this exchange" and turn the Utah Lake water into the creek.

The court below found that the Utah Lake water is inferior in quality to Little Cottonwood water and that turning it into the creek will render all the creek water below that point unfit for culinary or domestic use.

The statutes prohibit the turning of such water as that above described into natural streams. Laws Utah 1919, c. 67, § 9.

This application should have been rejected on the ground of illegality of purpose.

Throughout this discussion in so far as it holds that seepage is a use, I have held in mind those ancient, fully appropriated, and fully adjudicated streams of the same type, character, and history as Little Cottonwood. Nothing said or intimated in this discussion contemplates waste of water that results from broken or dilapidated ditches, or loss preventable at reasonable cost or by the exercise of ordinary care or intelligence. There is a point where usage may be of such a low order as to be classifiable as waste, but on an adjudicated stream this is a judicial question.

I am of the opinion that the decree of the trial court should be affirmed in all respects.

STRAUP, J. (concurring in part; dissenting in part).

I concur in the prevailing opinion of the CHIEF JUSTICE affirming the judgment of the court below as to the exchange application. I think the judgment should be affirmed also as to the application to appropriate water. In that I concur in the opinion of District Judge BRAMEL. What I thus say applies to that application.

At the threshold it is important to understand the nature and purpose of such application. The applicant, by his application filed in the state engineer's office, did not aver or state that there were in Little Cottonwood creek, the source of all of the waters involved, any public, undiverted, or unappropriated waters; nor did the engineer find that there were any such waters not theretofore diverted, appropriated, and beneficially used by others. While the applicant, in his application, stated that he made the application to acquire "the right to use a portion of the unappropriated waters of the State of Utah for irrigation purposes;" that the flow of water to be used and appropriated was ten cubic feet per second; that the waters were to be used from April 1 to October 31 of each year (covering the irrigation season); that the waters were to be stored each year from January 1 to December 31 (during the whole year); that the direct source of supply was from Little Cottonwood creek—yet, as explanatory to all that, the applicant, in his application, further stated that "the water applied for under this application is to be acquired through the construction of a pipe line to supply culinary water to those dependent upon the flow of Little Cottonwood through open channels for water for domestic purposes. The water so saved will be stored in what is known as the Beaver Pond Reservoir during the nonirrigation season and released for use upon the lands described during the irrigation season," giving

a description of the lands upon which the waters so saved were to be used for irrigation.

Thus the real purpose of the application was to construct a pipe line to supply culinary and domestic waters to those who were entitled to use and who were using such waters through open canals and ditches constructed by them, and especially to acquire a right to store and use all such waters so saved by supplying culinary and domestic waters to those entitled thereto by means of a pipe line instead of by open canals and ditches. What the applicant thus by his application represented is, not that there were unappropriated and undiverted public waters in the creek, but, if permitted to construct a pipe line system and by such means permitted to supply those entitled to culinary and domestic waters, he would be able as represented by him to save and store much of such waters which, as he contended, are lost by seepage and evaporation by having them carried in open canals and ditches to the premises of prior appropriators. That is the basis of the applicant's asserted right sought to be initiated by him. It is that which he calls an application to appropriate unappropriated, undiverted, and unused public waters of a natural stream or source of supply. Hence, at the very beginning is involved the troublesome and disputed question of jurisdiction or authority of the state engineer under the laws of this state to entertain, approve, and grant such an application for the purposes therein stated.

To the application, the respondent, the Little Cottonwood Water Company, and others similarly situated, filed a protest in the engineer's office, objecting to the granting of the application, denying that there were any unappropriated and undiverted waters of the creek, and alleging that all of such waters for more than fifty years had been diverted, appropriated, and beneficially used by the protestants and their predecessors in interest, and that in 1910 an adjudication was had in the district court of Salt Lake county in a cause wherein all persons interested or claiming to have any interest in or to the waters of the creek were parties, and a

decree rendered adjudging that all of the waters of the creek had been diverted, appropriated, and a beneficial use made of them by the parties to the cause and fixing and determining their respective rights in and to the use of all of the waters of the creek, and that such decree, ever since its rendition, was in full force and effect.

No findings were made by the engineer with respect to any of the matters presented by the protestants. Upon hearings had before him, the engineer but ordered that "this application is approved on the following conditions: (1) That actual construction work shall begin within six months; (2) that construction work shall be fully completed by December 20, 1928; (3) that the water appropriated shall be applied to the beneficial use set forth on or before December 20, 1930."

The protestants appealed to the district court, where, on a hearing before the court, and upon findings made and conclusions stated, the district court rendered a judgment disapproving the application and directing the state engineer to cancel it. From that, the applicant and the state engineer without a bill of exceptions and only on the findings, appealed to this court, contending that upon the findings as made the applicant was entitled to a judgment approving and confirming the application.

In addition to the findings referred to in the prevailing opinion is the finding:

"That said Leland H. Kimball under said application proposed to construct a pipe line from some point on said Little Cottonwood Creek not indicated in said application, and to take the water from said Little Cottonwood Creek which the plaintiff and its stockholders and other owners and users of water from Little Cottonwood Creek have heretofore used and to conduct said water to those dependent upon the same for culinary uses, and to supply the said owners, users, and those dependent upon the flow from Little Cottonwood Creek through said proposed pipe line, and proposes to take and store such water as may be saved, if any, by conducting a portion of the water now and heretofore flowing through the channels, ditches, canals, and conduits provided by the present owners and users of said water, and to appro-

priate any water which may be saved by conducting the same through a pipe line instead of through the open channels now owned, constructed and used by the plaintiff, its stockholders, and others similarly situated using water from said Little Cottonwood Creek."

By that finding the court clearly defined the nature of the applicant's claimed right to appropriate waters as applied for by him. Such, too, as is seen, is in accordance with the application itself filed in the state engineer's office. It is that kind of an application to acquire and appropriate waters in such manner and as so defined which the trial court disapproved and directed the engineer to cancel. It is that kind, and none other, before us for consideration. None other was considered by the engineer and none other was considered or determined by the trial court. And in our consideration of it I see no license or justification to wander from it.

The trial court further found that, in a case in the district court of Salt Lake county, in the case of *Union and East Jordan Irr. Co.* v. *Richards Irr. Co., et al.*, including the Little Cottonwood Water Company and all other persons as parties claiming any interest in or to any of the waters of Little Cottonwood creek, it, in 1910, among other things was adjudged and decreed:

"That in the year 1848 and in each year thereafter until and including the year 1856, the water of said stream, 'Little Cottonwood Creek,' was diverted into the ditches in this finding specified, and used and appropriated as a primary water right for agricultural, domestic, and culinary purposes, by certain of these defendants, and their predecessors in interest, during each and every year; and in the year 1856 all the primary water of said stream was appropriated for the purposes aforesaid by such defendants and their predecessors in interest, and the whole of such water then was, and ever since has been, and now is, reasonably necessary for such uses and purposes.

"That all persons that have any interest in the water of Little Cottonwood Creek have been duly served, and have either pleaded herein or the time to plead has elapsed, and no one has any right to this water except as specified in this decree.

"All known and unknown parties hereto, together with their agents and employees, are hereby enjoined from in any way interfering with the waters of Little Cottonwood Creek, except as specified in this decree."

The court further found that such decree, ever since its rendition, was in full force and effect and the waters of the creek distributed in accordance with the terms and conditions of the decree by commissioners appointed by the court from year to year; that, except in a comparatively short period in the month of May or June of each year when the flow of the creek was at its peak, all of the normal flow thereof during the irrigation seasons for many years by means of open canals and ditches of various lengths and capacities was diverted and used by the Little Cottonwood Water Company and others for irrigating purposes, and that many persons having rights to the use of such water also acquired the right to use and used them during irrigation seasons as well as in the winter months and nonirrigation seasons for culinary and domestic purposes. In such respect the court further found:

"That with the present means of diversion and conveyance, to wit, open canals and ditches, it is reasonably necessary for plaintiff and said other persons, firms and corporations entitled to the use of said waters for culinary and domestic purposes, to divert said entire fifteen second feet of water in order to deliver in usable condition at their respective points of use the amount of water actually used by them as hereinbefore stated for said culinary and domestic purposes."

The court, however, also found that, by supplying such users with culinary and domestic water by means of a suitable and proper pipe line system, which the applicant proposed to construct at his own expense, instead of by open canals and ditches, substantially ten second feet of water could be saved and stored, and that it was such waters which the applicant by his application and by such means sought to claim and appropriate.

Thus upon the findings it is made to appear that at the time of the filing of the applicant's application it was shown before the engineer, and also before the trial court, that all of the waters of the creek, for many years prior thereto had been diverted, appropriated, and used for irrigation and for culinary and domestic purposes, and that the respective rights of all persons, including the Little Cottonwood Water Company and its predecessors, in and to the use of all of such waters, for more than fifteen years prior to the filing of the applicant's application, by decree of a court of competent jurisdiction, had been decreed and determined, and that all of the waters of the creek had been diverted, appropriated and beneficially used by such prior appropriators, and that the waters so used and decreed were reasonably necessary for their respective uses and purposes.

It is said the engineer was not a party to that decree. What of it? Surely, he is not clothed with power to review, set aside, modify, revise, or disregard solemn decrees of courts of competent jurisdiction. The statute expressly forbids it. Until the decree is modified by a court of competent jurisdiction, the engineer is bound to respect it and to act accordingly. He may not ignore or disregard it on the unfounded claim that he was not a party to it.

But it is also said that neither was the applicant a party to the cause in which the decree was rendered. But he asserts no right which he then had or has since acquired, or which was not involved and adjudicated in the cause. So far as disclosed by the findings on this appeal, it nowhere is made to appear that the applicant assailed or questioned the decree rendered in 1910, or that he, as matter of fact, claimed anything hostile to or in conflict with it. No claim is made by him that since 1910 the status of the parties had changed, or that new conditions had arisen, or that the use of any of the waters awarded in 1910 had since been abandoned or the waters not beneficially used, or that more water was awarded by the decree to any party than was reasonably

necessary for his use and purpose. Nor, so far as appears by the applicant's application filed before the state engineer or by the findings made by the trial court, is it made to appear that there were any public, undiverted, and unappropriated waters of the creek or of any tributary thereof not theretofore diverted and appropriated by prior appropriators for irrigation and for domestic and culinary purposes. The applicant, by his application, did not aver nor did the engineer find, anything of that kind. To the contrary, the trial court expressly found that, when the applicant filed his application, and for many years prior thereto, there were no waters in the creek not theretofore diverted and used for irrigation and for culinary and domestic purposes.

What, then, are the waters which the applicant seeks to file on and claim or acquire by his application? They are waters theretofore diverted and appropriated by prior appropriators and for many years used by them for culinary and domestic purposes. That is shown by the applicant's application and clearly and expressly found by the trial court. What right or power has the state engineer to permit the applicant to do so? That is the question. The engineer has no powers except such as are expressly conferred upon him by statute. He can permit and entertain filings only on public and unappropriated waters of a natural stream or source of supply. Laws Utah 1919, c. 67, § 41. The statute is clear as to that. As is seen, there were no such waters in Little Cottonwood creek. The prior appropriators had a vested right in and to the use of all of such waters theretofore appropriated and diverted by them for beneficial purposes. An appropriator legally appropriating and diverting water for a beneficial use from a natural stream or source of supply acquires not only the right to the use thereof, but the corpus of the water itself becomes his property after the water has entered in and is carried or conducted by his private ditch or canal or by other private means of conveyance. *Salt Lake City* v. *Salt Lake City Water, etc., Co.*, 24 Utah 249, 67 P. 672, 61

L. R. A. 648; *Parks Canal, etc., Co.* v. *Hoyt,* 57 Cal. 44; *Spring Valley Waterworks* v. *Schottler,* 110 U. S. 347, 4 S. Ct. 48, 28 L. Ed. 173. The engineer has no authority to interfere with or disturb rights in or to any such waters.

Now, while the applicant does not seek to appropriate any waters directly out of private ditches or canals of prior appropriators, yet he seeks to take waters out of the natural stream to which the prior appropriators have acquired a vested right to the use thereof and to deliver such waters to them by means of a private pipe line system owned and controlled by him. If permitted to make a filing to do that, then the right to the use of the waters, as well as the property right in and to the corpus of the waters after they enter into and are carried by the private pipe line system, in effect are transferred from the prior appropriators to the applicant, and all right, title, and interest theretofore acquired by them in and to the use and to the corpus of the waters taken from them. I do not see what authority the state engineer has to interfere with or disturb such vested rights.

But it is urged that to require or to permit, in the winter time and in nonirrigating seasons, fifteen second feet of water of the creek to flow down to the premises of the prior appropriators for culinary and domestic purposes, when one second foot of water delivered to them by means of a pipe line system is all that is necessary for their use for such purposes, constitutes a waste by seepage and evaporation of about ten second feet of water when conveyed by means of open ditches and canals, and hence the applicant ought to be permited to save and reclaim such waters, and that, to accomplish such purpose, it is contended, a filing in the state engineer's office was a prerequisite. In considering such theory, let it again be noted that the applicant by his application did not claim a waste of water was committed by any one. Nor did the engineer or the trial court find that any waste had been committed. Not anything is found or claimed that the ditches or canals by means of which the prior appropriators coursed the waters to their premises

were improperly or negligently constructed or maintained, or that they were inefficient or unusual. The method by which they coursed the waters to their premises was the usual and customary method of carrying waters in this state. In coursing waters in open ditches and canals some loss of water by seepage and evaporation is unavoidable. But I cannot call such a loss a waste of water in a legal sense. To do so is to call about 90 per cent of all the customary and usual methods of carrying water in this state for irrigation and other purposes a waste of water. Much less may such a loss of waters be designated public and unappropriated waters of a natural stream or source of supply. What in effect the applicant seeks to accomplish is, not to reclaim waste waters, but to save or to conserve water, by proposing to construct a pipe line system to carry waters to users entitled thereto and thereby reduce a loss of water resulting from seepage and evaporation by having them carried in open canals and ditches, and to claim the benefit of what water may so be saved by his proposed system. Commendable as such a proposition or plan may be, yet I do not see anything in the statute authorizing the engineer to entertain or to determine it. As prescribed by the statute, the authority or jurisdiction of the engineer to proceed with or entertain or grant filings is dependent upon the essential jurisdictional fact that there are unappropriated and undiverted public waters in a natural stream or source subject to appropriation. Here there were none. All of them, as found by the trial court, having been appropriated and diverted by prior appropriators and coursed in private and suitable and properly constructed and maintained canals and ditches and by a usual and customary method in this state of carrying waters for irrigation and other purposes, the engineer had no further jurisdiction over such waters, except as further prescribed by the statute to exercise a supervision over a distribution of them in accordance with the acquired and vested rights of those entitled to the use of them.

Though the loss of water resulting from seepage and evaporation when carried in open canals and ditches by the prior appropriators for culinary and domestic purposes be regarded a waste of water, still I do not see what authority or jurisdiction the engineer had over the matter. The quotation in District Judge BRAMEL'S opinion from and his reference to the case of *Eden Irr. Co.* v. *District Court,* 61 Utah 103, 211 P. 957, show that the state engineer has no such authority or jurisdiction. That, too, is the holding in the case of *Tanner* v. *Beers,* 49 Utah 536, 165 P. 465. I do not well see how the filing of the application in hand may be permitted and approved without overruling or modifying those cases. Where a waste of water by a user is asserted or claimed, the statute, Laws Utah 1919, c. 67, § 39, prescribes the method of investigation and the remedy by which it may be determined. The method so prescribed is by reporting the alleged waste to the state engineer, or by petition to the district court for an investigation of the alleged waste, when the engineer may make an investigation and report this findings to the court of such alleged waste, or the court may order or make such an investigation, and, if such investigation warrants, may proceed to make a determination with respect thereto. The engineer is given no authority to determine the mater. He can only investigate it and report his findings to the court, who, and not the engineer, is clothed with power to determine it. No such proceedings were had, and, as heretofore shown, no charge or findings made of a waste of water.

But it in effect is further asserted that, inasmuch as under the laws of this state no right to water (forgetting that the statute refers to public and unappropriated waters in a natural stream or source) may be acquired except through an application filed in the office of the state engineer, the applicant, to initiate a right to claim or appropriate the waters referred to in his application and in manner as found by the trial court, was required to make a filing in the engineer's office, and, unless the engineer approved the

application, the applicant was not in position to assert any kind of right or claim against the prior appropriators, either as to an alleged waste of water, or as to any other kind of right or claim, and hence as a prerequisite to enable the applicant to initiate and assert a claim or right against the prior appropriators, the engineer was justified in granting and approving the application. If, as has been seen, the applicant by his application did not present anything which the engineer was authorized or justified to grant him, it certainly cannot be successfully contended that the engineer was required or justified in granting him a semblance of something to enable him to assert an apparent right which the engineer had no authority to give him, nor to enable or aid him to wage a contest with whomsoever may refuse to yied to demands of his unauthorized asserted claim or right. Surely no power or authority is conferred on the state engineer merely to enable an applicant to wage a contest or to carry on litigation with others, or to aid him to do what the engineer may not himself do, interfere with or disturb vested rights of others.

Observations also are made to the effect that, since upon the findings as made there is a flow of water of 250 second feet at high peak of the creek for a short period, in June or May, and, as is further asserted, that no claim was made that all of such waters were necessary to supply the use of prior appropriators, the conclusion is deduced that some of such waters at high peak were undiverted and unappropriated and subject to appropriation, and hence the applicant's filing may be considered as a claimed right to file on and appropriate such waters. In the first place, the conclusion deduced is mere argument and is against the express finding of the trial court; and, in the second place, the applicant by his application did not claim or seek to appropriated any such waters. Nor was the application granted or approved by the engineer on any such theory. The conclusion is merely gratuitous, and, as has been seen, is wholly inconsistent with what the applicant by his application

sought to accomplish, a right to claim and acquire water which he may save by delivering waters for culinary and domestic purposes to those entitled to the use thereof, by means of a pipe line system, instead of having such waters carried to the premises of prior appropriators by means of open canals and ditches.

FOLLAND, J., being disqualified, did not participate herein.